Bryan v. Bryan.

Joseph G. Bryan, Jane Bryan and Mary M. Gulick

v.

John Bryan et ux., Adam W. Crevelling et al.

[Decided January 3d, 1896. Filed June 4th, 1901.]

1. Testator devised a life estate to his widow, and "the remainder that may be left after the death" of his wife in equal remainders to his children. At testator's death the children were young, ranging from two to eleven years of age, and unable to care for themselves. After the testator's death his widow sold some of the land to various purchasers, the proceeds of which were used for her support and maintenance. One of the four heirs had mortgaged his undivided interest in the property before the sale of the lots.—*Held*, in partition between the heirs, that under the will the widow took a life estate, with power of alienation for her necessities, and hence the mortgage lien did not attach to the land sold by her.

2. Testator's widow was aged, feeble and unable to take care of herself, and lived with a daughter who was a seamstress. Their land did not produce enough to pay the taxes, and it became necessary to build a new dwelling-house, costing $1,200. During a period of at least five years land was sold and the proceeds devoted to the support and maintenance of the widow and to payments on the house. The entire sum received from such sales and used for such purposes was $1,847.66.— *Held*, in partition between the heirs, that such sum was no more than was sufficient for the proper support and maintenance of the widow, and hence the conveyances were valid.

3. Testator's widow took a life estate in realty with the power of alienation, and the remainder in fee was devised to the four children. The widow sold lots to various parties during her life, the heirs joining in the deeds with warranty. One of the heirs mortgaged his undivided interest in the property before any sale of the property.—*Held*, in partition between the heirs after the widow's death, that the question as to whether the mortgage lien was a cloud on the title to the property sold by the widow could be determined in the action, though the owners of the lots were not parties, since, the heirs being liable to their grantees on their covenants of warranty, they were entitled to the same standing as such grantees.

4. Where a widow took a life estate in property with the power of alienation and sold parts of it to various parties, a bill for partition between the heirs to remove a cloud, occasioned by one of the heirs mortgaging his undivided interest, on the title in the property sold by

the widow, was properly filed in equity, since the heirs, as grantors, not having the title, could not be relieved in an action at law.

5. Where several parties had purchased land from a widow who took a life estate with the power of alienation, and one of the children who took a fourth interest in the remainder, had mortgaged his undivided interest, a court of equity had jurisdiction of a partition suit between the heirs to remove a cloud from the title of the property conveyed by the widow, the legal title being in a number of people, to prevent a multiplicity of suits.

On final hearing on pleadings and proofs.

*Mr. Oscar Jeffery,* for the complainants.

*Mr. William A. Stryker,* for the defendant Crevelling.

PITNEY, V. C.

The bill has a twofold aspect and object:

*First.* It is a bill by three tenants in common against a fourth and his mortgagee for a partition of certain lands, the title to which the tenants derived by devise from their father, John Bryan the elder. As to this part of the case there is no room for dispute. There is none as to the title, and the right to partition is clear.

*Second.* The bill shows, and it is proven, that certain portions of the lands so derived from their ancestor have been sold for full consideration to divers purchasers, and conveyed by deeds containing full covenants of warranty and against encumbrances, executed by the four tenants in common, subsequent in date to the registry of a mortgage given by the defendant John Bryan upon his undivided share therein to the defendant Crevelling and now held by him. The prayer is that this mortgage may be declared not to be a lien upon the parcels so conveyed.

In the same line is an allegation, also sustained by the proofs, that the four tenants in common made a partial partition among themselves of a small portion of the premises, by which one small lot was conveyed to each of the complainants and one to the daughter and by her to the wife of John Bryan the

Bryan *v.* Bryan.

defendant; and the prayer is that those so conveyed to the complainants may be decreed to be free and clear from the lien of the Crevelling mortgage.

In support of these contentions the complainants rely upon the language of the will of their father, John Bryan, who died seized of the premises about the 1st of January, 1844, testate of a will executed in 1837, which, after providing for the payment of his debts, &c., proceeds as follows:

> "*Item.*—I give and bequeath to my beloved wife Rachel all my estate I now own and possess, after paying debts and expenses, as long as she remains my widow and to her children that she may have by me; should she marry again she is to have no more of my estate than the law gives her; as for my son, Aaron Bryan, and my daughter, Elizabeth Mitchel, they have their shares in advance, so that they are to have no more of my estate, but the remainder that may be left after the death or marriage of my wife to be equally divided between her children share and share alike as the law directs, and for the fulfilling of this my last will and testament, I appoint my beloved wife Rachel Bryan, my executrix, in whom I put my whole trust."

The three complainants and defendant John Bryan are the children of Rachel. She, Rachel, never re-married, and joined in the several conveyances above referred to, and, shortly before the filing of the bill, died intestate in her ninety-seventh year.

Complainants' contention is that by the true construction of the will Rachel had the power to dispose of at least so much of the land as was necessary for her support and maintenance, and that the several conveyances above mentioned produced no more than sufficient for that purpose.

Considerable evidence was adduced upon this question of fact, with the result that I conclude that the complainants' allegation in that behalf is proven.

The parcels sold to strangers were eleven building lots in the outskirts of the borough of Washington, a lot to the township. The proceeds of these sales were $1,995, subject to the expenses of surveying and preparing the deeds. This sum was realized between the years 1888 and 1893.

For the last ten or fifteen years of her life the widow was unable to do anything for her own support. The land did not produce enough to pay the taxes, the homestead dwelling became

dilapidated and unfit for occupation, and a new dwelling became necessary. The care and maintenance of the mother fell upon the complainant Jane. She was a seamstress, who was employed by persons desiring her services in their homes. This business she was obliged to abandon for several years and to devote her time and attention to the care and support of her mother.

The partial partition among the four children above referred to was made in 1890; and shortly before that date, to wit, in the fall of 1889, a new house was erected upon the lot conveyed to Jane. This house cost about $1,200, of which $100 was contributed by Jane, and part of the balance came from cotemporaneous sales of lots, and the remainder was borrowed and afterwards paid by the proceeds of later sales of lots.

At the time of the erection of this house the old lady was ninety-one years old. The last lot was sold in 1893. The proceeds of these sales were all given, directly or indirectly, to the complainant Jane in pursuance of a family arrangement and agreement to the effect that she should have the proceeds and the house for the care and maintenance of her mother. The total receipts from lots were $1,995; the cost of surveying and conveyances, $61.25; taxes paid on undivided lands, $86.09; total deductions, $147.34, leaving the net amount received by Jane, under this arrangement, $1,847.66, from which must be deducted the funeral expenses and so forth.

I think this is a liberal allowance for people living in the style these appear to have lived, and yet I cannot say that, under all the circumstances, it is either unfair or extravagant.

Two questions remain—*first,* is the complainants' construction of the will the true one; *second,* if so, are they entitled to the relief prayed, viz., a declaration and decree that Crevelling's mortgage is not a lien upon the lands conveyed by deeds in which the widow joined?

And first, as to the construction of the will. It is proper here to premise that the question for solution is not whether the widow took a fee which descended to her children as her heirs-at-law. The authorities are decidedly against any such result (*Downey* v. *Borden, 7 Vr. 460,* at *pp. 466, 467*), and

Bryan *v.* Bryan.

the parties make no such claim. But the question is simply whether she took a life estate with a power of disposition.

The character and condition of the estate of the testator should also be considered. The will was made in 1837, seven years before his death, when his oldest child was but four years old, and one or two of his children were born after the making of the will. The personal property was insufficient to pay the debts and a portion of the land was sold for that purpose.

Upon a reading of the clause in question there can be no doubt that under the first part of it the widow took an estate for life only, with the remainder to her children, and that the remainder was vested. If we omit the words "as long as she remains my widow" the estate would, under that part of the clause, still probably be one for life only under the authorities cited in *Theob. Wills pp. 200, 203.* The use of the words "children that she may have by me," have been held to turn what would otherwise have been a joint estate in the mother and her children into an estate for life in the mother with the remainder to her children.

The power of disposition in the life tenant must arise, if at all, by implication from the use of the words *"but the remainder that may be left after the death or marriage of my wife to be equally divided,"* &c. Here it is to be observed that the will contains no bequests or devises of any kind to persons other than the widow which could diminish the estate in her lifetime, and there was no personal estate to be spent or consumed in its use. So that the words quoted cannot be satisfied by any consumption of personalty or payments of intermediate legacies. There was nothing to dispose of but land.

Now the familiar and cardinal rule is that force and effect must, if practicable, and in the absence of repugnancy, be given to every word in the will. Bearing this rule in mind it is impossible not to conclude that when the testator used the words just quoted he had in mind that his wife might, during the period of her possession under his will, make use and disposition of some part of his estate in such a manner as to diminish its quantity; and that such use and disposition must be authorized by the language he had just used, for he is presumed to

4

Bryan *v.* Bryan.

have known that, as doweress, she would have no such right. Hence, he must have thought that he had given her the power to make such disposition by the words previously used.

Now the words, "I give and bequeath to my beloved wife Rachel all my estate I now own and possess after paying debts and expenses," are quite ample for that purpose; and it is not difficult to conceive that the testator used them in that sense, and then, having got so far in his disposition of his estate, he thought of the possibility of his widow's marrying again, and added—"as long as she remains my widow"—without supposing that he thereby detracted from the power given her in the previous words. Then in the words, "*the remainder that may be left* after the death," &c., we have the testator's own interpretation of his own language, to the effect that he expected that his wife would consume, by use, some part of the property given to her for life. Of course, such consumption could only be effected by a conveyance.

This view is materially strengthened by the concluding words of the clause, viz., "And for the fulfilling of this my last will and testament I appoint my beloved wife, Rachel Bryan, my executrix, *in whom I put my whole trust.*" Unless she had some power of disposition over the estate there was nothing to entrust to her.

I think the clause may be properly read (omitting members which do not affect its construction for present purposes) thus:

"*Item.* I give and bequeath to my beloved wife Rachel and to her children that she may have by me, as long as she remains my widow, all my estate I now possess, *but the remainder that may be left after the death or marriage of my wife* to be equally divided between her children share and share alike as the law directs, and for the fulfilling of this my last will and testament I appoint my beloved wife Rachel Bryan, my executrix, in whom I put my whole trust;"

and, so read, I find it difficult to escape the conclusion that the testator intended that his wife and children should have the right to use some part of the body of his estate, as well as its income, as their necessities might require, and that his wife should determine the necessity and its extent. *He put his whole trust in her.*

Looking at the authorities, the case most nearly in point that I have been able to find is one in this court arising under the will of Adam Rienaker.   The verbiage of that will was this:

"My will and desire is that all my property, both real and personal, shall be for the sole use and benefit of my wife Julianna after my decease, and in the event of her death then *what shall remain* to be disposed of in the manner following," &c.

It first came before the late Chancellor Runyon, in *Naundorf v. Schumann, 14 Stew. Eq. 14.*   On page 15 that learned judge uses this language:   "The will gives to the widow no power, express or implied, to dispose of the property or any part of it in any way.   At her death the whole of it is to be converted into cash and divided among the other legatees.   The testator, indeed, used the qualifying words, *'what shall remain,'* but he probably used them in view of the fact that some of the personal property was of a consumable character."   Here it will be observed that he does not deny that the force of those words must be taken into account in giving a construction to the will.

The bill in that case was filed for instructions by the administrator with the will annexed, after the death of the widow. The will came again before the present Chancellor (McGill) in *Rodenfels v. Schumann, 18 Stew. Eq. 383,* where the question arose (as here) between a person to whom the widow had conveyed a portion of the landed estate of her husband, and the persons interested under the will of Rienaker; and the learned chancellor there held that the conveyance made by the widow was efficient to pass the title.   At page 387 he uses this language:   "In the absence of the words *'what shall remain,'* the direction for the disposition of the estate at the death of the wife, by implication, determines that the estate to her was for life.   But upon the authority above cited [*Downey v. Borden, 7 Vr. 460*] *if the words 'what shall remain,' in the connection in which they are used, create a power of disposition in the widow, the bequest over is void, and she took a fee.*   The question, then, is narrowed to this, Did they create such a power?   I cannot resist the conclusion that they did.   In making provision for

his wife, the testator made use of most liberal terms. *All* his property, real and personal, was to be for her *sole* use and benefit. That use and benefit was unrestricted and uncontrolled. It was not limited to consumption of income, or to mere physical enjoyment. It was to be something more than mere usufruct, for it was not to survive the use intact. *It was contemplated that some part of it was to be consumed in the wife's use and benefit. The remainder alone was thereafter to be dealt with.* In the disposition of that remainder the wife's next of kin was placed on equality with the testator's own, and thereby some right of the wife in the property superior to that which would admit of his giving her the mere usufruct of it during her life was recognized. *I think that a broader meaning should be given to the words 'what shall remain' than to say they refer merely to personal chattels consumable by use. To my mind, they plainly imply a power of alienation in the widow.* 'This being so, she took a fee in her husband's property, and that fee passed to the complainant, Mrs. Rodenfels, by her deed."

In the case in hand it appears, as before stated, that the personal estate was insufficient to pay the debts, so that the probability that the testator had chattels only in view in using the language in question is very slight. And in addition we have the circumstance that the children were all young, their ages varying from two to eleven at their father's death, and the burden of their education and maintenance during their minority naturally fell on the mother. Such conditions render it the more easy to believe that the testator intended his wife should have something more than a bare life estate.

The testamentary disposition in *Rodenfels* v. *Schumann* differed from that here under consideration in that the immediate words of devise to the widow in that case were indeterminate in expression as to the amount of the estate, whether in fee or for life, and therefore would have given her a fee by implication. *Downey* v. *Borden, 7 Vr. 460.* That implication, however, was rebutted by a devise over after the death of the first taker, and the estate was, in the absence of other expressions of a power of disposition, reduced to one for life. There was no express power of disposition given, and the question pro-

pounded and considered by the chancellor was whether such power should be implied from the use of the words "what shall remain." That learned judge held, as above quoted, that such implication did arise from those words, and a conveyance by the life tenant was upheld.

Briefly stated, there was, in *Rodenfels* v. *Schumann,* an estate in fee cut down by implication from a devise over to one for life, without express power of disposition, and such power was implied from the use of the words "what shall remain" after the devise over. In the case in hand we have an estate for life without express power of disposition, with a devise over of the "remainder that may be left" after the determination of the life estate. I am unable to distinguish the two cases in principle, and therefore must hold that the conveyances by the widow were effective to pass the title, not because she took a fee, as in *Rodenfels* v. *Schumann,* but as the proper exercise of a power entrusted to her by the testator.

Among the numerous English cases arising out of inartificial wills resembling this I find none precisely in point.

That there is no repugnancy in the gift of a life estate with an indefinite power of disposition and a devise over of what shall remain, was held in *Surman* v. *Surman, 5 Madd. *122,* the substance of which case is as follows:

"Bequest of household goods, &c., after payments of debts, &c., to testator's wife for her life, or widowhood, with power to her to sell the same as she should think proper, for her own benefit and the maintenance of testator's nephew and daughter-in-law, during their minority, with a bequest over, upon the death or second marriage of the wife of the same, *or so much as should then remain* to such nephew and daughter-in-law.— *Held,* that the widow was entitled to the residue for her life or widowhood, with a power to apply any part of the capital for her own benefit and the proper maintenance of the nephew and daughter-in-law during their minorities; and that on the death or marriage of the widow, the remainder of the capital unapplied was well limited over."

And, again, in *Doe* v. *Glover, 1 Man., G. & S. 448 (50 Eng. Com. L. 447),* the question was between the devisee of a tenant for life and a remainderman. The original devise was of lands—

"Unto my son, Mordecai Glover, and his heirs and assigns forever; to hold to him and to his heirs and assigns forever; but, in case my said son, Mordecai Glover, shall happen to depart this life without leaving any issue of his body lawfully begotten then living, or being no such issue, and he my said son *shall not have disposed and parted with* his interest of, in and to the aforesaid copyhold estate and premises, then and in such case, I give and devise the same customary or copyhold messuages, cottages, lands, tenements, hereditaments and real estates unto, and to the use of, my illegitimate daughter Ann Stevenson."

Mordecai Glover was admitted as tenant of the copyhold, and died without issue and without having conveyed the premises, testate of a will by which he attempted to dispose of the land. It was held that the father's devise over was good of all that the son had not conveyed in his lifetime. Chief-Justice Tindal (at *p. 459*) said: "The testator, in the first place, gives the estate to his son and to his heirs, should he have any; and he gives him full power to dispose of it in his lifetime. But he goes on to evince, in the event of his son dying and having no issue, a natural desire that the estate should go to his illegitimate daughter, *provided his son's wants should not have made it necessary for him to part with it in his lifetime.* And this was by no means an unreasonable mode of dealing with the property. For these reasons, I am of opinion that the plaintiff is entitled to judgment."

To the same effect is *Upwell* v. *Halsey, 1 P. Wms. 651.* There the testator, being possessed of personal estate, and having a wife and sister, who was the plaintiff, but no issue, by will gives ten pounds to his sister and directs that such part of his estate as his wife should leave for her subsistence should return to his sister and the heir of his body, and appointed his wife executrix. The wife married the defendant and afterwards died, upon which the sister sued the defendant, the second husband, for an account of this personal estate. The court said: "It is now established that a personal thing or money may be devised to one for life, and remainder over; and as to what has been insisted on, that the wife had a power over the capital or principal sum, that is true, provided it had been necessary for her subsistence, not otherwise; so that her marriage was not a gift in law of this trust money."

The case of *Constable* v. *Bull, 3 De G. & Sm. 411, 18 L. J.
(N. S.) Eq. 302; S. C., 13 Jur. 619* (which is the better report),
was as follows:

> "I give, devise and bequeath unto my dear wife, Mary Ann Constable,
> all and every my estate and effects, goods, chattels, houses, lands, moneys,
> securities for money due or growing due, every matter and thing what-
> soever, and wheresoever the same may be at the time of my decease,
> for her sole, separate use and benefit. I further give, will and direct
> that, at the decease of my said wife, *whatever remains* of my said estate
> and effects shall go to and be equally divided, share and share alike, be-
> tween the following persons hereinafter named, or so many of them as
> may be then living."

The estate consisted of copyhold estates which he had con-
tracted to sell, and long leaseholds and government annuities.
She possessed herself of the money, and spent considerable of
of it, but did not pay all the debts, and died intestate. The
dispute related to personalty and was between her administrator
and an administrator with the will annexed of her husband.
The question was whether the widow was entitled to the whole,
so that it passed to her administrator, or whether what remained
went over to the persons named in the will. It was suggested
by Mr. Giffard, in argument, that the words "whatever remains"
might be explained in two ways: first, that they might be
applicable to what remained after payment of debts, funeral
and testamentary expenses; and secondly, that they might refer
to the perishable nature of some of the property, and to what
might be left of that which was perishable. In delivering judg-
ment Vice-Chancellor Knight Bruce said: "There is a difficulty,
rather critical than substantial, in the way of adopting the
suggestion of Mr. Giffard, and which had before occurred to my
mind; it is this, that it is impossible to attribute to the testator
the notion that the payment of the debts, funeral and testa-
mentary expenses, was to be postponed until after the decease of
his widow. The gift to the wife is universal in the first instance,
and then follow the ulterior gifts, with the words 'whatever
remains of.' I have already said that the only question is,
whether the use of these three words, 'whatever remains of,' have
the effect of preventing the gift to the widow being construed

as a life interest. It is quite clear that, if those three words were omitted, the terms of the gift, subsequent to the gift to the widow, would cut down her estate to a life interest. Of that no one can doubt. The question is, whether, in the present state of the authorities, I am bound to put such a construction on the words here used as to destroy the intention of the will. As at present advised, I think the state of the authorities is not such as to require me to do so. There are several theories which might be attributed to these words, either of which would be inconsistent with construing them so as to give the widow the power to spend, or give away, or dispose of the property in question. I think, as at present advised, that the other legatees have a substantial interest under the words used by the testator and that such of them as were living at the death of the widow will be entitled."

It will be observed that the question was not as to the validity of any disposition which the widow had made in her lifetime, but as to whether the use of the words "what remains" would not give an absolute interest to the widow, notwithstanding there was a bequest over, and that the learned judge did not deny, but that the words in question did, by implication, give the life tenant a limited power of disposition.

This renders it unnecessary to consider another proposition started by complainants, namely, that even if the conveyance by the widow did not convey a good title, yet, as a portion of the proceeds of the sales of land was used to erect a house on Jane's lot, Crevelling should not be permitted to have the benefit of the increased value in her lot and also of a share in the lots which produced the increase.

The remaining question is as to the right of the complainants to a decree that the Crevelling mortgage is not a lien upon the lots so conveyed by the widow. Their right is put upon the ground that they entered into covenants of general warranty in those conveyances and are entitled to be relieved from any liability thereon.

The mortgage in question constitutes a cloud upon the title, and, in that respect, the bill resembles that in *Rodenfels v. Schumann, supra.* It is, however, not filed expressly under

the statute authorizing bills to determine claims to real estate and to quiet title, and must rather be classed as a bill to remove a cloud from the title which may be entertained without the aid of the statute.

The only objection made by the defendant Crevelling to this part of the bill was that the several grantees of the lots, other than the complainants and defendant, were not before the court. No objection was made on account of misjoinder or multifariousness. At first I was inclined to think that the objection of want of parties was fatal, but, upon further consideration, I think it cannot avail. It is true that if the opinion and determination of the court herein be adverse to the grantees of the parties to this suit they will not be bound by it, and, *vice versa*, it may well be that they cannot take advantage of a determination adverse to Mr. Crevelling. Upon this point I express no opinion; but the question remains whether the complainants have not a right to have the question determined as between them and Mr. Crevelling. Being liable to the several owners of the lots conveyed upon their covenants of general warranty and against encumbrances, they are, in my judgment, entitled in this court to the same standing that any of such grantees would have, and it may be added that their standing in equity is greater than that of the present holders of the legal title, in this, that if it be admitted that the latter have a remedy at law against the mortgage in question, or by bill filed under the act above referred to, the complainants have no such remedy, and can only be relieved in this court.

The circumstances, also, are such as to render the intervention of this court desirable. The bond and mortgage in question was given on January 25th, 1876. No bill has ever been filed or other proceedings taken to enforce it. How lately the payments have been made on it does not clearly appear. The property conveyed is held by several owners, and if they desire to remove the cloud each must bring a separate suit. This shows the element of multiplicity of suits.

Again, if a bill were filed to foreclose the mortgage, or an action of ejectment brought upon it, the holder would make out

Bryan *v.* Bryan.

a *prima facie* case by proving the seizin of John Bryan the elder, his death, and that the mortgagor, John Bryan the second, was one of his children. This would throw upon the holder of the title the burden of proving the will of John Bryan the first, and the conveyances by the widow and her right to convey.

Under these circumstances it seems to me that a proper case is made for the action of the court.

The general principle that this court has jurisdiction to remove clouds from title is undisputed. But a distinction has been taken between those cases where the instrument which produces the cloud is void upon its face, and those in which it is *prima facie* good and some extrinsic evidence is necessary to show its invalidity. I think this case falls under the latter class.

Chancellor Runyon, in *Shotwell* v. *Shotwell, 9 C. E. Gr. 378* (at *p. 380*), quotes, with approbation, the language of the court in *Martin* v. *Graves, 5 Allen 601,* as follows: "Whenever a deed or other instrument exists, which may be vexatiously or injuriously used against a party after the evidence to impeach or invalidate it is lost, or which may throw a cloud or suspicion over his title or interest, and he cannot immediately protect or maintain his right by any course of proceedings at law, a court of equity will afford relief by directing the instrument to be delivered up and cancelled, or by making any other decree which justice and the rights of the parties may require."

The whole subject is discussed with great clearness and learning by Mr. Justice Seldon in the case of *Ward* v. *Dewey, 16 N. Y. 519* (at *p. 525*). He there reviews all the authorities and shows that they clearly hold that where a deed or mortgage constitutes a cloud upon title the party affected thereby has a right to come into a court of equity to have it removed, although he has a perfect defence at law, unless the invalidity of the deed appears upon the face of it.

To the same effect is *Sherman* v. *Fitch, 98 Mass. 59;* and *Clouston* v. *Shearer, 99 Mass. 209;* and *Chipman* v. *City of Hartford, 21 Conn. 488,* where there is also an elaborate examination of the authorities.

I will advise a decree in accordance with these views.